***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Glenn and the briefs and arguments before the Full Commission. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, or to rehear the parties or their representatives. The Full Commission AFFIRMS with modifications the Opinion and Award of the Deputy Commissioner.
 *********** *Page 2 
The Full Commission finds as fact and concludes as a matter of law the following, which were entered into at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the North Carolina Industrial Commission and the Industrial Commission has jurisdiction of the parties and of the subject matter of this case. All the parties are bound by and subject to the North Carolina Workers' Compensation Act. All parties have been correctly designated and there is no question as to the misjoinder or nonjoinder of any party.
2. Plaintiff was employed by Chemtek, Inc. from May 2005 through August 31, 2006 and returned mid-spring 2007 through mid-summer 2007.
3. Key Risk provided coverage for Chemtek from March 31, 2005 through March 30, 2006 and May 16, 2006 through August 2006. Travelers provided coverage for Chemtek from April 1, 2006 through May 15, 2006.
4. An employee-employer relationship existed between plaintiff and defendant-employer at all times relevant herein.
5. Plaintiff's average weekly wages will be determined from an IC Form 22 to be provided by defendants.
6. The issues to be determined are:
 a. Whether plaintiff developed an occupational disease as a result of his employment with defendant-employer and if so, what benefits, if any, is plaintiff entitled to receive under the North Carolina Workers' Compensation Act? *Page 3 
 b. When was plaintiff last injuriously exposed to the hazards of the alleged occupational disease?
 c. Whether plaintiff is entitled to attorney's fees for the unreasonable defense of this matter?
 e. Whether plaintiff's claims are barred by any provision of N.C. Gen. Stat. § 97-1 et seq.?
7. The following exhibits were admitted into evidence at the hearing before the Deputy Commissioner:
 a. Stipulation Exhibit #1: IC forms, plaintiff's medical records, and discovery (1370 pages);
 b. Plaintiff's Exhibit #3: Cooper's Guide;
 c. Plaintiff's Exhibit #5: Report of Mr. Petty; and,
 d. Plaintiff's Exhibit #7: Mr. Petty's CV.
 ***********
The Pre-Trial Agreement along with its attachments and any additional stipulations are hereby incorporated by reference as though they were fully set out herein.
 ***********
Based upon all of the competent evidence adduced from the record, the Full Commission makes the following:
 FINDINGS OF FACT
1. Plaintiff was 37 years old at the time of the hearing before the Deputy Commissioner. After graduating from high school and prior to starting work for defendant-employer, *Page 4 
plaintiff held various jobs including working in fast food, cooking, fixing machinery in hosiery mills, driving trucks, and building bombs.
2. Plaintiff was diagnosed with acute myeloid leukemia ("AML") — Type M4 on September 6, 2006, which involves an inversion of the 16th chromosome.
3. In the early 2000's, plaintiff was employed by a previous employer as a truck driver. In a civil lawsuit filed by both plaintiff and his wife, the couple alleged that plaintiff was exposed to gasoline while employed by this company and that said exposure led to the development of his AML.
4. From 2002 to 2005, plaintiff was employed by Entwistle, a manufacturer of weapons for the government. Plaintiff's employment with Entwistle required him to constantly wipe down heli rings with a rag immediately after it had been dipped in toluene. The toluene sat in an open parts washer bucket which was located approximately 1.5 feet away from plaintiff. Plaintiff estimated that he dipped the rag in the toluene approximately 180 times over the course of each eight to ten hour day. He performed this same task during the entire time he was employed by Entwistle from 2002 to 2005.
5. Plaintiff's hands began cracking open secondary to his exposure to toluene while working for Entwistle. This cracking continued for the remainder of his employment with Entwistle. Eventually, plaintiff contacted Dr. Kinnaird (a chemist at Chemtek with whom plaintiff's wife worked at the time) to inquire about gloves he could use to protect himself from the toluene without negatively impacting his job performance. Plaintiff never wore the recommended gloves due to the fact that they would have reduced his productivity.
6. Plaintiff also experienced constant headaches while working around the toluene during his employment with Entwistle. When these headaches became a regular occurrence, *Page 5 
plaintiff began bringing medication to work on a daily basis in anticipation of treating the headache which he knew would soon develop.
7. Entwistle has also been named as a defendant in a civil lawsuit filed by both plaintiff and his wife, who are alleging that plaintiff developed AML due to his exposure to toluene while employed by Entwistle.
8. After leaving Entwistle in 2005, plaintiff began working for Chemtek as a maintenance worker in its maintenance department. In this capacity, plaintiff was primarily responsible for servicing vehicles and equipment at the Chemtek plant as well as performing various plumbing and electrical tasks.
9. In late 2005, Chemtek began manufacturing a product initially known as "Rejuvaseal," but later renamed "PaveRx." The product, which was designed to protect airport runways, contained certain federally-mandated specifications including a refined coal tar base, organic solvent carrier, and coal tar oils. Dr. Kinnaird, the Chemtek chemist who developed the product, testified that PaveRx consisted of the following three component parts: (1) light carbolic oil; (2) RT-12; and (3) Aromatic 100.
10. In order to determine the potential human hazards presented by the product, Dr. Kinnaird examined the Material Safety Data Sheets (MSDSs) of the raw materials which combined to form the overall product. Based upon his research and review of the component parts which went into the overall PaveRx product, Dr. Kinnaird determined that neither the overall product nor any of its component parts contained benzene. Therefore, Dr. Kinnaird considered the possibility of benzene exposure secondary to the manufacture of PaveRx to be negligible at best. *Page 6 
11. PaveRx was manufactured by Chemtek on a total of nine occasions during the entirety of plaintiff's employment. A comparison of plaintiff's timecards to the PaveRx production records indicates that plaintiff was present at the Chemtek facility for only six of the nine occasions on which PaveRx was manufactured.
12. When plaintiff was not performing work at other jobsites, he was generally present in the production area when PaveRx was being manufactured. Plaintiff's role in the production of the PaveRx involved moving hoses, repairing electrical box malfunctions, and being generally present in the event that equipment maintenance or repair was needed. The entire PaveRx production process, from start to finish, lasted anywhere from four to eight hours. Plaintiff spent only a portion of this time in the actual manufacturing area and was not present for the entirety of the production process.
13. As a part his job with defendant-employer, plaintiff used a parts washer to clean grease and debris off the various items with which he was working. As part of this cleaning process, plaintiff would use mineral spirits and a brush to scrub the item in question while holding it in a sink. Plaintiff wore nylon surgical gloves while performing this task which would tear or come apart on a regular basis. Plaintiff did not use the parts washer on a daily basis and when he did use the parts washer, it was for one to two hours.
14. Plaintiff began smoking cigarettes in his early twenties and occasionally smoked cigars. During his youth, his mother smoked and as a result he was exposed to smoke until he left home.
15. As a primary hobby, plaintiff repaired and restored automobiles for his personal use. This hobby began between ages 10 and 12. By age 13, plaintiff had acquired his first car, a 1964 Ford which he was able to get running. The work he performed on these automobiles *Page 7 
included rebuilding carburetors, which required him to clean the carburetor with mineral spirits. He also performed brake work on these automobiles, which required use of brake cleaner.
16. Plaintiff used a riding mower to mow the grass of the seven-acre yard at his personal residence. He also maintained the lawn mower, which involved minimal exposure to gasoline and other petroleum products.
17. Stephen Petty, a certified industrial hygienist retained by plaintiff, agreed that plaintiff was exposed to gasoline while employed as a truck driver for several food vendors from 2000 to 2002 and to toluene while employed by Entwistle from 2002 to 2005. He also opined that plaintiff was exposed to significant levels of benzene secondary to the PaveRx manufacture process and his use of the parts washer. In calculating these figures relative to benzene exposure, Mr. Petty relied upon various documents from the 1920's through the 1970's which showed the existence of benzene in certain historical versions of the same general category of constituent parts that were used to create PaveRx. Furthermore, Mr. Petty assumed that plaintiff was exposed to a Safety-Kleen solvent as well as Varsol, a mineral spirit, during his use of the parts washer. Mr. Petty further assumed that plaintiff was exposed to coal tars and coal tar pitches during the PaveRx manufacturing process. Mr. Petty described these latter substances as having a benzene content of 60% to 90%. Mr. Petty went on to testify that he believed these figures to be representative of the benzene levels in the compounds used at Chemtek.
18. Mr. Petty admitted that, in calculating plaintiff's alleged level of exposure at Chemtek, he had not taken into account most of the MSDSs for the various compounds that went into creating the PaveRx or that were used in connection with the parts washer. Instead, Mr. Petty concluded that the MSDSs he pulled from alternate sources, such as textbooks, libraries, and various commercial services, more closely resembled the products used at Chemtek. *Page 8 
19. Mr. Petty noted that none of the MSDSs for the PaveRx, its constituent parts, or the mineral spirits used in connection with the parts washer listed benzene as an ingredient. He was of the opinion that benzene was present in these products based upon his research and the nature of the substances that were used to make PaveRx.
20. Rather than relying upon the facts supported by the evidence presented in this matter, Mr. Petty based his exposure calculations on antiquated data involving constituent parts that were never present at the Chemtek facility. Specifically, Mr. Petty assumed that Chemtek used Safety-Kleen solvent, a mineral spirit known as Varsol, coal tars, and coal tar pitches in its manufacture of PaveRx. None of these items were used in the PaveRx manufacturing process or even present at the facility in any capacity. Nevertheless, Mr. Petty declined to use or even consider in his calculations the MSDSs from the products that were actually used by Chemtek. He also calculated the benzene content in the products allegedly used at the Chemtek plant by using data taken from the 1920's through the 1970's. The antiquated nature of this data is highlighted by one product cited by Mr. Petty as containing between 60% and 90% benzene. Plaintiff has not offered any evidence that such a product still exists or was used at Chemtek.
21. Mr. Petty concluded that plaintiff was exposed to significant levels of benzene secondary to the PaveRx manufacturing process and his use of the parts washer.
22. Based upon Mr. Petty's calculations, Dr. Nachman Brautbar, a medical practitioner retained by plaintiff, opined that plaintiff was exposed to significant levels of benzene secondary to his employment with Chemtek which placed him at an increased risk of developing AML. In reaching this opinion, Dr. Brautbar advised that he understood plaintiff's specific diagnosis to be AML — Type M4, which is a particular subset of the more general *Page 9 
diagnosis of AML. Dr. Brautbar acknowledged that the biological marker of plaintiff's particular form of AML was the inversion of his 16th chromosome.
23. Dr. Brautbar indicated that the way in which benzene causes leukemia is not fully known. He acknowledged that the vast majority of individuals that are exposed to benzene do not ultimately develop AML. As such, he noted that it was possible for an individual who had been exposed to benzene to develop leukemia, but the benzene exposure would not be the cause of such leukemia.
24. Dr. Brautbar also noted that he saw references to plaintiff being exposed to harmful substances outside of his employment with defendant-employer. Such exposures included plaintiff's hobby of working with cars as well as his smoking history. Dr. Brautbar opined that if plaintiff spent a significant amount of time working with cars, he would consider this as a contributing factor in plaintiff's development of AML. Dr. Brautbar opined that plaintiff's cigarette smoking was a contributing factor in his development of AML, as cigarette smoking is responsible for more than half of all leukemia diagnoses.
25. Matthew Parker, a certified industrial hygienist retained by defendants, advised that none of the MSDSs for the products used at the Chemtek facility or their constituent parts identified benzene as a chemical constituent. Mr. Parker stated that this means that the concentration of benzene in each such product or constituent part could not have been above 0.1%.
26. Mr. Parker opined that plaintiff had a benzene exposure of one part per million years secondary to his involvement in the PaveRx production process while at Chemtek. Mr. Parker noted that the permissible exposure limit for benzene is one part per million for an eight hour day (as compared to an entire work year). As such, Mr. Parker concluded that plaintiff's *Page 10 
actual benzene exposure secondary to the PaveRx production process was 1/2000th of the permissible exposure limit.
27. Based upon these same materials, Mr. Parker further calculated plaintiff's exposure to benzene during his use of the parts washing process to be 0.05 parts per million. In arriving at this conclusion, Mr. Parker used a similar position to plaintiff's and did not review what plaintiff did as a parts washer.
28. Mr. Parker opined that plaintiff was not exposed to benzene at levels above the permissible exposure limit.
29. Robert James Ph. D., a toxicologist, reviewed the materials in this matter and explained that approximately 80% to 90% of AML diagnoses constitute de novo AML, meaning that they are the natural result of genetic deficiencies and are thus idiopathic. In contrast to denovo AML, secondary AML constitutes AML that arises from some chemical agent. Based upon his review of the materials in this matter, Dr. James opined that plaintiff has developed de novo AML, as the cause of his condition could not be determined. Dr. James based this conclusion in part upon his review of the MSDSs of the various chemicals present at the Chemtek facility. Dr. James testified that none of the MSDSs he had reviewed listed benzene as a component part. As such, Dr. James testified that this meant each product contained no more than a thousand parts per million years of benzene, which he referred to as "a de minimis amount."
30. Dr. James performed his own analysis to determine plaintiff's exposure to benzene while working for defendant-employer. Based upon his analysis, Dr. James determined plaintiff to have been exposed to 0.177 parts per million years of benzene while employed by defendant-employer. Dr. James further explained that if plaintiff had only been present on six *Page 11 
occasions when PaveRx was being manufactured, it would likely reduce plaintiff's exposure to approximately 0.100 parts per million years of benzene.
31. Dr. James opined that plaintiff was not at an increased risk of developing AML as a result of benzene exposure while employed by defendant-employer. In arriving at his opinion, Dr. James considered both dermal exposure and inhalation exposure to benzene in calculating plaintiff's overall exposure. Dr. James indicated that a threshold dosage of approximately 200 parts per million years of benzene would be needed in order to increase an individual's risk of developing leukemia in even the smallest amount and plaintiff's exposure was much lower. He further indicated that any exposure below 200 parts per million years threshold would have no effect whatsoever on an individual's development or non-development of AML.
32. Dr. James considered plaintiff's smoking history to be a factor in his development of AML. He based this conclusion on the fact that the National Cancer Society has recognized smoking as one of the leading causes of chemically-inducted AML. Dr. James further explained that the myriad of carcinogens in cigarette smoke "can induce leukemia via a bunch of ways that don't necessarily have to include the fact that it has a small amount of benzene in it."
33. Dr. James indicated that the median age for developing AML — Type M4 is 34. He thus concluded that because plaintiff was diagnosed with AML — Type M4 at age 33, his pattern and development of the disease is in line with a de novo (or idiopathic) case. He went on to explain that plaintiff's development of the disease "is what we would expect from one of the normal occurring background cancers."
34. The conclusions reached by Dr. James are given more weight than the conclusion reached by Dr. Brautbar, as the exposure levels calculated by Dr. James are found to be better indicators of the actual level of benzene to which plaintiff was exposed. *Page 12 
35. Plaintiff's employment with defendant-employer was not a significant contributing factor to his development of AML and did not place him at an increased risk of developing AML as compared to members of the general public not so employed.
 ***********
The foregoing stipulations and findings of fact engender the following additional:
 CONCLUSIONS OF LAW
1. N.C. Gen. Stat. § 97-57 provides that "a defendant employer is liable to an employee for onset of an occupational disease if the employee demonstrates that he or she (1) suffers from a compensable occupational disease, and (2) was last injuriously exposed to the hazards of the disease while employed by the defendant employer."Jarrett v. McCreary Modern, Inc.,178 N.C. App. 234, 238, 605 S.E.2d 197, 200 (2004).
2. While neither leukemia, AML, or AML — Type M4, the particular form of AML with which plaintiff was diagnosed, is one of several specifically enumerated compensable occupational diseases listed in N.C. Gen. Stat. § 97-53, the statute provides that "a disease or condition not specifically enumerated in the statute may nonetheless qualify as a compensable occupational disease if the employee shows that: (1) [the disease is] characteristic of persons engaged in the particular trade or occupation in which the claimant is engaged; (2) [the disease is] not an ordinary disease of life to which the public generally is equally exposed with those engaged in that particular trade or occupation; and (3) there [is] `a causal connection between the disease and the [claimant's] employment.'"Rutledge v. Tultex Corp.,308 N.C. 85, 93, 301 S.E.2d 359, 365 (1983) quoting Hansel v. ShermanTextiles, 304 N.C. 44, 52, 283 S.E.2d 101, 106 (1981). The burden of proving each of these elements lies with the employee seeking *Page 13 
workers' compensation benefits. Moore v. J.P. Stevens Co.,47 N.C.App. 744, 750, 269 S.E.2d 159, 163, disc. review denied,301 N.C. 401, 274 S.E.2d 226 (1980).
3. To prove compensability for an occupational disease under N.C. Gen. Stat. § 97-53(13), an employee must establish a direct correlation between the nature of his employment and an increased risk of developing the disease for which he seeks workers' compensation benefits. Booker v. Duke Medical Center,297 N.C. 458, 472, 256 S.E.2d 189, 199 (1979); Humphries v. Cone MillsCorp., 52 N.C. App. 612, 279 S.E.2d 56 (1981). "To be within the purview of the Law, the disease must be so distinctively associated with the employee's occupation that there is a direct causalconnection between the duties of the employment and the disease contracted." Booker, 297 N.C. at 473-4, 256 S.E.2d at 199, quotingRussell v. Camden Cmty. Hosp.,359 A.2d. 607, 611-12 (Me. 1976) (emphasis added).
4. The first two elements of the Rutledge test generally require an employee to produce evidence that his employment placed him at an increased risk over the general public of developing the disease in question, in this case, AML — Type M4. In order to satisfy this third element of the Rutledge test, the employee must show that the job in question "was a significant causal factor in, or significantly contributed to, the development of the occupational disease."Jarrett, 178 N.C. App. at 240, 605 S.E.2d at 203. The North Carolina Supreme Court has defined "significant" to mean "having or likely to have influence or effect: deserving to be considered: important, weighty, notable." Rutledge,308 N.C. at 101-02, 301 S.E.2d at 370. The factual inquiry, in other words, should be whether the occupational exposure was "such a significant factor in the disease's development that without it the disease would not have developed to such an extent that it caused the physical disability which resulted in claimant's incapacity for work."Id. Plaintiff has failed to prove that his employment with defendant placed *Page 14 
him at greater risk that the general public of contracting a compensable occupational disease or that plaintiff's employment with defendant — employer caused him to contract a compensable occupational disease.
5. As with any complex medical issue, the elements of an occupational disease claim must be proven through competent evidence from a medical expert. See Click v. Pilot Freight Carriers, Inc.,300 N.C. 164, 265 S.E.2d 389 (1980). When such expert opinion testimony is based merely upon speculation and conjecture, it can be of no more value than that of a layman, and is not sufficiently reliable to qualify as competent evidence on issues of medical causation. See Young v.Hickory Bus. Furniture,353 N.C. 227, 230, 538 S.E.2d 912, 915 (2000). As articulated by the North Carolina Supreme Court in Holley v. ACTS, Inc.,357 N.C. 228, 581 S.E.2d 750 (2003),
 In cases with "complicated medical questions far removed from the ordinary experience and knowledge of laymen, only an expert can give competent opinion evidence as to the cause of the injury." "However, when such expert opinion testimony is based merely upon speculation and conjecture . . . it is not sufficiently reliable to qualify as competent evidence on issues of medical causation." "[T]he evidence must be such as to take the case out of the realm of conjecture and remote possibility, that is, there must be sufficient competent evidence tending to show a proximate causal relation."
Id. at 232, 581 S.E.2d at 753 (citations omitted). Furthermore, expert opinions based on inaccurate assumptions of fact do not rise to the level of competent evidence. See Thacker v. City ofWinston-Salem, 125 N.C. App. 671, 482 S.E.2d 20; disc. reviewdenied, 346 N.C. 289, 487 S.E.2d 571 (1997). See also Young,353 N.C. at 232, 538 S.E.2d at 916 (holding that experts cannot rely on the maxim "post hoc, ergo propter hoc," meaning "after this, therefore because of this," as the basis for an opinion on causation, because this maxim "assumes a false connection between causation and temporal sequence"). *Page 15 
6. Because plaintiff failed to carry his burden of proving that his employment with defendant-employer was a significant contributing factor to his development of AML and placed him at an increased risk of developing AML as compared to members of the general public not so employed, he has failed to prove that he suffers from a compensable occupational disease. N.C. Gen. Stat. § 97-53(13).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 ORDER
1. Plaintiff's occupational disease claim must be and is hereby DENIED.
2. The parties shall bear their respective costs.
This ___ day of November, 2011.
 S/______________ TAMMY R. NANCE COMMISSIONER
CONCURRING:
 S/______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/______________________ LINDA CHEATHAM COMMISSIONER *Page 1